133 T.C. No. 7

UNITED STATES TAX COURT

ESTATE OF NOORDIN M. CHARANIA, DECEASED, FARHANA CHARANIA, MEHRAN
CHARANIA AND ROSHANKHANU DHANANI, ADMINISTRATORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16367-07.                    Filed September 14, 2009.


        Decedent (D) and his wife were born and married in
Uganda and were citizens of the United Kingdom.  In
1972, they were exiled from Uganda and moved to
Belgium.  D and his wife did not formally change their
marital regime under the procedures prescribed by the
Belgian Civil Code.  At the time of his death in 2002,
250,000 shares of Citigroup stock were held in D's
name.  The estate contends that the shares were
community property under Belgian law and that only one-
half of the value of the shares is included in the
value of the gross estate.

        The estate tax return was not timely filed.  The
estate asserts reasonable cause as a defense to a sec.
6651(a), I.R.C., addition to tax and asserts that prior
abatement of a similar addition to tax is a concession
by R.

1.  Held:  The shares were not community property, because Belgian conflict of laws rules would apply English law to the marital regime.  Under English law, the shares were property of D.

2.  Held, further, the estate has not established reasonable cause for late filing of the return.

Diane Currier Ryan, William F. Sheehan, and Laura Rees Acosta, for petitioners.

Mary P. Hamilton, for respondent.


OPINION


COHEN, Judge:  Respondent determined a deficiency in the Federal estate tax of the Estate of Noordin M. Charania (the estate) in the amount of $2,070,000.01 and an addition to tax under section 6651(a)(1) for the late filing of the estate tax return.  The issues for decision are:  (1) Whether the value of the gross estate includes the value of all of the shares of a U.S. corporation registered in the name of Noordin M. Charania (decedent), a nonresident alien, at his date of death and (2) whether the estate is liable for the section 6651(a)(1) addition to tax.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

This case was submitted fully stipulated under Rule 122, and the stipulations of the parties are incorporated herein by this reference. Decedent, a resident of Belgium, died on January 31, 2002. As the sole beneficiaries of the estate, Roshankhanu Dhanani (Mrs. Dhanani), Farhana Charania (Ms. Charania), and Mehran Charania (Mr. Charania) are the administrators of the estate under Belgian law. At the time the petition in this case was filed, Mrs. Dhanani was a resident of Belgium, and Ms. Charania and Mr. Charania were residents of England. For purposes of this Opinion, in describing the arguments made the estate and the administrators are referred to as petitioners.

Decedent was born in 1930 in Uganda and was a citizen of the United Kingdom. Mrs. Dhanani was born in Uganda and is a citizen of the United Kingdom. On October 9, 1962, Uganda, a former British protectorate, became independent from Britain.

Decedent and Mrs. Dhanani were married on February 18, 1967, in Uganda. Decedent and Mrs. Dhanani did not sign a marriage contract at any time before or after their marriage. While living in Uganda, decedent worked as the sole proprietor of a company called Transit Congo, which acted as an agent for CMB, a Belgian shipping company.

In 1972, Idi Amin, President of Uganda, ordered the expulsion of Ugandans of Asian descent, providing a 3-month

deadline for them to leave.  Accordingly, decedent and his family left Uganda permanently in October 1972 and moved to Belgium. When decedent and Mrs. Dhanani left Uganda, all of their assets within Uganda were seized by the Government, they did not own any securities or other assets outside of Uganda, and they left Uganda with only a few items of personal property.  Decedent and Mrs. Dhanani did not intend to return to Uganda and intended to stay in Belgium indefinitely.

While living in Belgium, decedent continued to be self-employed as an agent for the Belgian shipping company CMB.  Mrs. Dhanani was not employed in Belgium.

Decedent and Mrs. Dhanani resided in Belgium from the time they were forced to leave Uganda in 1972 through the time of decedent's death on January 31, 2002.  Decedent and Mrs. Dhanani remained citizens of the United Kingdom at all times.

Belgian law permits married couples to modify or change the matrimonial regime defining their property rights during marriage and specifies procedures for doing so.  See Code Civil art. 1394 (Codes Larcier, Vol. I, Droit Civil et Judiciaire 2008) (Belg.). Decedent and Mrs. Dhanani did not execute any documents in Belgium requesting that their marital property regime be changed to a community property regime.  On June 17, 1985, decedent executed a will, leaving his property one-third each to Mrs. Dhanani, Ms. Charania, and Mr. Charania.

In August 1997, decedent purchased 50,000 shares of Citicorp stock that were held in safekeeping in an account in the name of "Mr. Noordin M. W. Charania" at a branch of a Belgian bank in Hong Kong that later became Fortis Bank Asia HK (Fortis account). On or about October 21, 1998, these Citicorp shares were converted into 125,000 shares of Citigroup, Inc. (Citigroup) stock. As of July 16, 1999, decedent owned 187,500 shares of Citigroup, consisting of decedent's purchased shares plus a stock dividend of 62,500 shares. In 2000, a stock split resulted in decedent's acquiring 62,500 additional Citigroup shares. At the time of decedent's death, these 250,000 shares of Citigroup were registered in decedent's name and remained in safekeeping in the Fortis account.

On January 31, 2002, the value of 250,000 shares of Citigroup common stock was $47.16 per share, or $11,790,000. On July 31, 2002, the value of the 250,000 shares of Citigroup common stock was $33.25 per share, or $8,312,500.

On October 31, 2002, a Form 4768, Application for Extension of Time to File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes, was sent to the Internal Revenue Service (IRS) on behalf of the estate by petitioners' former counsel. The estate applied for an extension of time to file an estate tax return until April 30, 2003, and an extension of the time to pay the estate tax until October 31, 2003. The IRS

approved the extension to file until April 30, 2003, but took no action regarding the extension to pay the estate tax. On November 13, 2002, the estate paid tax of $1,150,732.33.

On December 18, 2003, Mrs. Dhanani, as decedent's surviving spouse, executed the Charania Qualified Domestic Trust Agreement between Roshankanu Dhanani, as settlor, and Farhana Charania, Mehran Charania, and Gregory D. Testerman, as trustees.

On April 29, 2004, the estate mailed to the IRS a Form 706-NA, United States Estate (and Generation-Skipping Transfer) Tax Return, electing the alternate valuation date of July 31, 2002. Treating the Citigroup stock as community property, on Schedule A, Gross Estate in the United States, the estate reported:

> At the decedent's death 250,000 shares of Citigroup Inc. common stock stood in his name. Under Belgian law the decedent and his wife, Roshankhanu Dhanani, each held a one-half community interest in these shares. Accordingly, a one-half interest, or 125,000 shares, is included in the gross estate of the decedent.

A letter dated November 6, 2002, from Nele Daem, an attorney licensed to practice law in Belgium, representing petitioners, was attached to the return. The letter stated, in part

> I have been advised by my clients that the decedent, at his death, held 250,000 shares of the common stock of CITIGROUP Inc. in account with FORTIS BANK ASIA HK. The account was titled in the sole name of decedent. I have also been advised that the account consists of assets acquired by the decedent and Mrs. DHANANI during their marriage, and that no part of the account consists of assets acquired by either of them by gift or inheritance during the marriage or by other means that would cause the assets to be considered the

separate property of one spouse under the law of Belgium.

Under Belgian law, the account was therefore the community property of the decedent and Mrs. DHANANI immediately prior to the death of the decedent. As community property, one-half of the account was owned by the decedent, and one-half of the account was owned by Mrs. DHANANI, notwithstanding that title to the account was in the sole name of the decedent. Upon the death of the decedent, Mrs. DHANANI became entitled to receive one-half of the assets held in the account as her community property, and this one-half of the assets was not subject to disposition by the Will of the decedent or to succession to the heirs of the decedent by operation of law. Mrs. DHANANI's right to receive one-half of the assets held in the account is due to her community interest in the account prior to the death of the decedent and not to any right arising from the death of the decedent.

On February 22, 2007, the IRS sent to the estate a notice of deficiency determining that the value of all 250,000 shares should be included in the value of decedent's gross estate. The notice also determined an addition to tax under section 6651(a)(1).

Petitioners sent to the IRS a letter dated July 6, 2007, requesting that the addition to tax be waived on the ground that the failure to file and pay any taxes owed in a timely manner was not due to willful neglect, but reasonable cause. The IRS abated the additions to tax that had been assessed on June 21, 2004, during the administrative portion of this case.

The parties agree that our decision in this case is appealable to the Court of Appeals for the First Circuit.

## Discussion

Decedent and Mrs. Dhanani, United Kingdom citizens, after being exiled from the place of their births and marriage, made Belgium their residence for approximately 30 years and intended to remain in Belgium indefinitely. Thus both were domiciled in Belgium at the date of decedent's death--a matter respondent does not dispute. The decisive question is thus whether the forced exile of decedent and his wife from Uganda altered the location of the matrimonial domicile, as used to determine the marital property regime under applicable law. Few precedents have been identified, and none of the authorities relied on by the parties is directly in point or categorical. None of the authorities is recent.

As a general rule, the Internal Revenue Code imposes a Federal tax "on the transfer of the taxable estate (determined as provided in section 2106) of every decedent nonresident not a citizen of the United States." Sec. 2101(a). The taxable estate of a nonresident not a United States citizen is defined in section 2106(a) as "the value of that part of * * * [a decedent's] gross estate which at the time of his death is situated in the United States", less applicable deductions. Section 2103 specifies that the gross estate of a nonresident alien "shall be that part of his gross estate (determined as provided in section 2031) which at the time of his death is

situated in the United States."  Thus, the gross estate of a nonresident alien comprises "all property, real or personal, tangible or intangible", to the extent provided in sections 2033 through 2045, so long as that property is located in the United States.  Secs. 2031(a), 2103.

Under section 2104(a), corporate stock held by a nonresident who is not a U.S. citizen is deemed property situated within the United States only if it is stock issued by a domestic corporation.  A domestic corporation is one organized in the United States or under the law of the United States or of any State.  Sec. 7701(a)(4).  It is not disputed that the Citigroup stock is property situated within the United States because it is stock issued by a domestic corporation and that an estate tax return must be filed because decedent's gross estate in the United States exceeds $60,000.  See sec. 6018(a)(2).

Section 2033 provides that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Petitioners contend that Citigroup shares registered in decedent's name at his death were community property under Belgian law, and that only one-half of the value is included in the value of decedent's gross estate.  Respondent argues that the Citigroup shares were not community property but separate property according to English law.

Community property is not defined in the Internal Revenue Code for estate and gift tax purposes. See section 2033 and the regulations thereunder. To resolve this issue, we must examine foreign law. Under Rule 146, the determination of foreign law is an issue of law for this Court, and we may consider any relevant material or source, whether or not submitted by a party or otherwise admissible in evidence. See Fed. R. Civ. P. 44.1; see also Pittway Corp. v. United States, 88 F.3d 501, 504 (7th Cir. 1996).

Pursuant to Rule 146, the parties have submitted copies of relevant materials and sources that they rely on, including foreign cases. Additionally, respondent relies on the following English conflict of laws treatises: (1) Dicey, Morris & Collins on the Conflict of Laws (Lawrence Collins et al. eds., 14th ed. 2006) (hereinafter Dicey, Morris & Collins); (2) Dicey & Morris on the Conflict of Laws (Lawrence Collins et al. eds., 11th ed. 1987); and (3) Cheshire and North's Private International Law 163 P.M. North & JJ. Fawcett eds., 12th ed. 1992). Respondent also submitted reports from the Law Library of Congress that evaluate matrimonial property regimes under Belgian conflicts law, whether Belgian or English law would apply in this case, and whether any Ugandan law dealt with movable property ownership of spouses once domiciled in Uganda. Neither the Law Library of Congress foreign law specialist who wrote the report on Ugandan law nor the Court

found any material to indicate whether Uganda law would govern the ownership of movable property of spouses once domiciled in Uganda who had left Uganda.

Petitioners rely principally on an opinion prepared on their behalf by London Barrister Matthew Cook regarding English law and an opinion from Professor Hans Van Houtte, a Belgian law professor.

Petitioners' reply brief concisely and fairly summarizes the analysis presented by the parties as follows:

> (a) Belgian law determines whether or not the 250,000 Citigroup shares were held as community property;
> (b) under Belgian conflict of laws principles, the ownership of matrimonial property is governed by the law of the common nationality of the spouses, in this case the law of the United Kingdom;
> (c) the key question for decision is whether an English court in this case would follow the doctrine of immutability, under which the question whether property is held as community property turns on the law of the parties' domicile at the time of marriage, or the doctrine of mutability, under which the question turns on the law of the parties' domicile at the time of the decedent's death;
> (d) if the immutability doctrine applies, ownership of the Citigroup shares continued to be governed by English substantive marital property law even after the move of Decedent and his spouse to Belgium, and Petitioners must lose this case because Decedent and his spouse did not formally change their marital regime under the procedures prescribed by the Belgian Code Civil;
> (e) if, on the other hand, the doctrine of mutability applies, Petitioners win, because the exile of Decedent and his spouse from Uganda and their arrival in Belgium with the intent to remain there permanently brought them as a matter of law under Belgium's community property regime, with no need to follow the Code Civil formalities.

Determining the Marital Regime

Applying Belgian conflict of laws rules, the answer to the question presented is found by reference to English law, including English conflict of laws rules. Under English conflict of laws rules, in the absence of a contract or settlement, the rights obtained by a husband or wife in each other's movable property as a result of marriage are determined by the law of the matrimonial domicile, whether the property is possessed at the time of the marriage or acquired afterwards. See Re Egerton's Will Trusts, (1956) Ch. 593; Collier, Conflict of Laws 281 (3d ed. 2001). Thus the matrimonial domicile in this case is determined according to English law.

Under English conflict of laws principles, a person's domicile is his or her permanent home, where he or she resides without any intention of moving from it permanently or for an indefinite period of time. See Dicey, Morris & Collins pars. 6-004 and 6-005. A person can acquire a domicile of choice through a combination of residence and intention of permanent or unlimited residence exclusively in the domicile of choice. See id. par. 6-034.

Historically, the matrimonial domicile has been deemed to be the domicile of the husband at the time of marriage. See Collier, supra at 281. When the parties are domiciled in the same country at the time of the marriage, the issue of domicile

does not typically arise, and "in the absence of special
circumstances, that country is the matrimonial domicile."  Dicey,
Morris & Collins n.6, par. 28-009; Re Egerton's Will Trusts,
supra.  In this case the spouses were domiciled in the same
country at the time of marriage, and English law would identify
the matrimonial domicile of decedent and Mrs. Dhanani as Uganda
from the time of their marriage until they were exiled from
Uganda.  See Re Egerton's Will Trusts, supra.  (The Domicile and
Matrimonial Proceedings Act 1973 now provides that a married
woman's domicile is to be ascertained by the same factors as any
other individual's domicile.  See Cheshire and North's Private
International Law 163.  This Act is not applicable here because
decedent and Mrs. Dhanani were married before its enactment.  In
any event, both spouses here apparently always maintained the
same domicile.)

As petitioners recognize, the issue to be decided is
whether English law would recognize a change in decedent and Mrs.
Dhanani's matrimonial domicile to Belgium as effecting a change
in their property rights.  English law is unsettled regarding
this issue.  It has been summarized as follows:

> There are two competing theories, those of
> 'immutability' and 'mutability'.  According to the
> first, * * * the parties' property acquired after the
> change of domicile is subject to the regime which was
> established before the change of domicile.  Under the
> latter doctrine, * * * rights to property acquired
> after the change are regulated by the law of the

parties' domicile at the date of its acquisition.
[Collier, supra at 282.]

The primary English case dealing with migratory spouses and movable property is De Nicols v. Curlier, (1900) A.C. 21, 26.  In this case the House of Lords held that the matrimonial regime applicable to the parties was not affected by the change of domicile.  In De Nicols, the husband and wife were both French citizens married in France.  At the time, French law provided that property of the marriage was community property.  Thereafter, they moved to England and accumulated substantial wealth.  The husband predeceased the wife.  In his English will he attempted to dispose of his entire movable estate, as permitted under English law, by establishing a trust for the life benefit of his wife.  The surviving wife contested the provisions of the will, contending that under French law she already had a vested interest in half of her husband's personal property acquired during the marriage and that French law should control the disposition of all property acquired before and after the spouses became domiciled in England.  The House of Lords ruled for the surviving spouse on the premise that, absent other agreement, under French law the spouses were deemed to have adopted the community property regime for the duration of their marriage as if they had signed a contract to that effect, an implied contract theory.  The French law of community property

applied to the property acquired after they became domiciled in England, just as to property acquired before the move.

In reaching the decision in De Nicols v. Curlier, supra, the House of Lords distinguished the earlier case of Lashley v. Hog, 4 Paton 581 (Scottish Appeals Case 1804), identifying that case as considering an issue of rights of inheritance under the applicable law of domicile at death and not marital property rights. In Lashley, the spouses were domiciled in England at the time of their marriage and later moved to Scotland, where the wife predeceased the husband. After the husband's death an issue arose as to whether all the property of the marriage or only half would be disposed of entirely to his heirs. The court held that half of the combined marital estate passed under Scottish succession law to the heirs of each spouse.

Respondent asserts that

> Although De Nicols v. Curlier is not a modern decision, it has never been overruled. Further the House of Lords in De Nicols rejected the result in Lashley v. Hog on a number of grounds. De Nicols clearly recognizes an implied contract of spouses upon marriage, and there has been no intervening decision to the contrary.

Respondent contends that "since Decedent and Mrs. Dhanani had the common nationality of a common law country, and did not select a community property regime after they moved to Belgium, their marital regime by default is that of separate property."

Applying the traditional analysis, decedent and Mrs. Dhanani, as citizens of the United Kingdom marrying in a country where the law is based upon English common law, at the time of their marriage would have considered that British law, separation of property, applied regarding their marital property. Petitioners, however, contend that De Nicols v. Curlier, supra, is distinguishable from this case, primarily because "The case says nothing at all about circumstances of forced exile."

London Barrister Matthew Cook suggests in his opinion, prepared at petitioners' request, that under an implied contract theory as applied in De Nicols v. Curlier, supra, when decedent and Mrs. Dhanani changed their domicile they must be considered to have chosen to accept the law of their new domicile--Belgium-- including the principles of matrimonial property that Belgium may apply. Barrister Cook further opines that a

> British court would apply the doctrine of mutability, under which the domicile of a married couple may be changed under certain circumstances (such as forced exile) rather than the doctrine of immutability, under which a couple's domicile cannot be changed except by a document signed by them. Applying the doctrine of mutability a British court would hold that the spouses' forced exit from Uganda and their establishment of a permanent domicile in Belgium changed their marital domicile from Uganda to Belgium, with the result that Belgian substantive law would govern their rights in marital property.

In his opinion, Professor Van Houtte quotes a passage from Dicey, Morris & Collins, supra at 431:

"The doctrine of immutability does not produce satisfactory results if the spouses are forced to change their domicile by political or economic pressure.  It does not seem reasonable that refugees, who have acquired a domicile of choice in England or elsewhere after their marriage, should continue to be governed for the rest of their lives by the law of their matrimonial domicile."

Petitioners have neither provided persuasive authority nor proposed a workable rule as to when mutability becomes effective. They have not cited any law suggesting that the earnings of decedent from which the shares were purchased were community income under the laws of Belgium.  See, e.g., Angerhofer v. Commissioner, 87 T.C. 814 (1986); Westerdahl v. Commissioner, 82 T.C. 83 (1984); Zaffaroni v. Commissioner, 65 T.C. 982 (1976). There are no objective criteria for determining that a change in the character of their marital property occurred and, if so, whether it took effect immediately or 5, 10, or 20 years after decedent and Mrs. Dhanani left Uganda.  The only objective evidence is that the Citigroup shares were acquired and held solely in decedent's name in 1997, approximately 25 years after the move to Belgium.

Although they resided in Belgium for 30 years, decedent and Mrs. Dhanani did not take the steps available under Belgian law to change their marital property regime, and there is no other evidence of their intention, before the date of death, to change the character of their property.  The parties have not cited, and we have not found, any authorities that determine the nature of

property without regard to intent, expressed or implied, according to the law applicable at the time of the marriage.

We conclude that under English law, applied pursuant to Belgian conflict of laws principles, all of the shares of Citigroup stock were property of decedent taxable in his estate.

Section 6651(a)(1) Addition to Tax

Petitioners argue that no addition to tax should be imposed because the failure to file the estate tax return timely was due to reasonable cause rather than willful neglect.

Under section 6075 an estate tax return is due within 9 months after the date of a decedent's death. The IRS may grant a reasonable extension of the time to file an estate tax return. See sec. 20.6081-1(c), Estate Tax Regs. An extension of time for filing a return does not operate to extend the time for payment of the estate tax. Sec. 20.6081-1(e), Estate Tax Regs.

Executors who are abroad may request extensions beyond the automatic 6-month period. See sec. 6081(a); sec. 20.6081-1(b) and (c), Estate Tax Regs. The regulations provide that the request for an extension of time to file should be made before the expiration of the time within which the return is due and early enough to enable the IRS to consider the request and reply to it. Sec. 20.6081-1(c), Estate Tax Regs.

In this case, the Form 4768 request for an extension was filed October 31, 2002. The IRS granted an extension for filing

the estate tax return until April 30, 2003.  The record does not indicate that petitioners requested an extension for filing beyond the initial request that the IRS granted.  The estate tax return was filed April 29, 2004, approximately a year after the extended due date.

Section 6651(a)(1) provides that in the case of failure to file a tax return on the date prescribed for filing (including any extension of time for filing), there shall be added to the tax required to be shown on the return an amount equal to 5 percent of that tax for each month or fraction thereof that the failure to file continues, not exceeding 25 percent in the aggregate, unless it is shown that the failure to file timely is due to reasonable cause and not due to willful neglect.

Reasonable cause for delay is established where a taxpayer is unable to file timely despite the exercise of ordinary business care and prudence.  United States v. Boyle, 469 U.S. 241, 246 & n.4 (1985); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  "[W]illful neglect" has been defined as a "conscious, intentional failure or reckless indifference."  United States v. Boyle, supra at 245.  Whether a failure to file timely is due to reasonable cause and not willful neglect is a question of fact. Id. at 249 n.8; Commissioner v. Walker, 326 F.2d 261, 264 (9th Cir. 1964), affg. on this issue 37 T.C. 962 (1962).

Petitioners argue that reasonable cause for the failure to file timely is established by their counsel's actions related to (1) the legal complexities regarding the ownership of the shares by decedent's spouse and (2) the practical steps required to form a qualified domestic trust.

Respondent, relying on United States v. Boyle, supra, asserts that petitioners have not presented any details as to why the return was late and that the record does not support petitioners' assertion of reasonable cause because administrators have a duty to ascertain the due date of the estate tax return and file it timely, regardless of any reliance on counsel.

In Boyle, the executor hired an attorney for his mother's estate.  The attorney received pertinent information and documents necessary to file the estate tax return for the estate and assured Boyle that the return would be filed on time, but it was filed 3 months late because of a clerical error.  Id. at 242-243.  The Supreme Court in Boyle also noted factors that have been considered "reasonable cause" by the IRS including

> unavoidable postal delays, the taxpayer's timely filing
> of a return with the wrong IRS office, the taxpayer's
> reliance on the erroneous advice of an IRS officer or
> employee, the death or serious illness of the taxpayer
> or a member of his immediate family, the taxpayer's
> unavoidable absence, destruction by casualty of the
> taxpayer's records or place of business, failure of the
> IRS to furnish the taxpayer with the necessary forms in
> a timely fashion, and the inability of an IRS
> representative to meet with the taxpayer when the
> taxpayer makes a timely visit to an IRS office in an

> attempt to secure information or aid in the preparation
> of a return. * * * [Id. at 243 n.1.]

None of the above factors is present here.  There is no evidence of steps taken by petitioners to assure that the return was filed on time.  Petitioners have asserted generally that they relied on counsel to determine whether a U.S. estate tax return was due, that there were legal complexities regarding the ownership of the Citigroup shares, and that time was necessary to form a qualified domestic trust.  The reasonableness of their actions and excuses for lateness is not self-evident.

Regulations provide that even if the information available is not sufficient to permit preparation of a complete estate tax return as of an extended due date for filing such a return, a return that is as complete as possible must be filed by that due date.  Sec. 20.6081-1(d), Estate Tax Regs.; see also sec. 20.6018-2, Estate Tax Regs.  Additionally, filing of supplemental information is permitted.  See Estate of Eddy v. Commissioner, 115 T.C. 135, 142 (2000); sec. 20.6081-1(d), Estate Tax Regs.

The estate tax return mailed to respondent on April 29, 2004, reported the shares as community property, as indicated on the extension request dated October 31, 2002.  Thus, it does not appear that petitioners were unaware of the requirement of filing a return or the due date or that their filing position changed from the date of their extension request to the date the return

was filed. The alleged complexities are not among the circumstances recognized to constitute reasonable cause.

Petitioners also argue that because the IRS abated additions to tax that had been assessed at the time the return was filed, the remaining addition to tax under section 6651(a)(1) should also be abated because there is no logical or legal reason for treating the section 6651(a) addition differently for the deficiency than there was for the amount reported on the late-filed return.

Respondent contends that in the absence of a closing agreement or other binding agreement covering the late-filing addition to tax, the applicability of the addition to tax in dispute must be decided on the record before the Court.

This Court has held that the IRS did not exceed its statutory authority by determining an addition to tax after an abatement of a late-filing addition to tax. See sec. 7121; Estate of Wilbanks v. Commissioner, 94 T.C. 306 (1990) (the determination of reasonable cause by the director of an IRS service center under section 301.6651-1(c), Proced. & Admin. Regs., is an administrative action and does not estop the IRS from later reasserting the addition to tax for late filing); sec. 301.7121-1(a), Proced. & Admin. Regs. Petitioners have not shown any agreement that would preclude the determination of the

addition to tax here.  Because the record does not establish reasonable cause, the addition to tax will be sustained.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.