# United States Court of Appeals
## For the First Circuit

No. 09-2430

ESTATE OF NOORDIN M. CHARANIA ET AL.,

Petitioners, Appellants,

v.

DOUGLAS L. SHULMAN, COMMISSIONER OF INTERNAL REVENUE SERVICE,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES TAX COURT

[Hon. Mary Ann Cohen, Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

William F. Sheehan, with whom Goodwin Procter LLP was on
brief, for appellants.
Patrick J. Urda, Attorney, Tax Division, U.S. Dep't of
Justice, with whom John A. DiCicco, Acting Assistant Attorney
General, and Richard Farber, Attorney, Tax Division, were on brief,
for appellee.

June 17, 2010

*Hon. David H. Souter, Associate Justice (Ret.), of the
Supreme Court of the United States, sitting by designation.

**SELYA**, <u>Circuit Judge</u>. In a letter written on November 13, 1789, Benjamin Franklin famously warned that "in this world nothing is certain but death and taxes." This appeal proves the enduring wisdom of Franklin's pithy admonition. The tale follows.

`Refined to bare essence, the appeal presents two interconnected questions. The first, which concerns the amount of tax due, turns on whether shares of stock held in the name of a decedent were community property under the marital property regime of Belgium (where the decedent and his wife resided when he acquired the shares and when he died) or the decedent's separate property under the marital property regime of England (which was the marital property regime in effect where the decedent and his wife resided at the time they celebrated their marriage). The second question concerns a refusal to abate a fragment of a penalty assessed in consequence of the late filing of the decedent's estate tax return.

The tax court held that England's separate property regime applied and that, therefore, all the shares were includable in the decedent's gross estate for federal estate tax purposes. <u>Estate of Charania</u> v. <u>Comm'r</u>, No. 16367-07, 133 T.C. No. 7, 2009 WL 2924091, at *8 (Sept. 14, 2009). It simultaneously refused to abate the fragment of the late-filing penalty. <u>Id.</u> at *10. The decedent's estate and heirs (collectively, the Estate) assign error to both rulings.

We affirm in part and reverse in part. We agree with the tax court that the disputed shares were the decedent's separate property and, thus, were includable in full in his gross taxable estate. We disagree, however, with the tax court's refusal to abate the balance of the penalty.

## I. BACKGROUND

The raw facts are set forth in a stipulation submitted to the tax court pursuant to Tax Court Rule 122. See Estate of Charania, 2009 WL 2924091, at *1. We offer a thumbnail sketch, beginning with the identities of the protagonists, proceeding through the more important of the stipulated facts, and ending with the travel of the case.

The decedent, Noordin M. Charania, and his wife, Roshankhanu Dhanani, married in Uganda in 1967. Both of the newlyweds were native Ugandans. Uganda had been under the hegemony of the United Kingdom for many years and, therefore, both spouses were citizens of the United Kingdom.

After their nuptials, the couple made their home in Uganda. The decedent worked as an agent for a Belgian shipping company. In 1972, Idi Amin, then the ruler of Uganda, ordered the expulsion of Ugandans of Asian descent. Mindful of this edict, the decedent and his wife, who were both of Asian descent, fled to Belgium. They took only a few items of personal property; all of

their assets within Uganda were expropriated by the Ugandan government.

The couple arrived in Belgium in October of 1972, intending to remain there indefinitely. The decedent resided in that country until he died on January 31, 2002. He was survived by his wife and children, Farhana and Mehran. His will, without specific enumeration of particular assets, bequeathed one-third of his property to his wife and one-third to each of his two children.

At no time had the decedent and his wife availed themselves of a mechanism, available under Belgian law, that permits married couples to modify or change the matrimonial regime governing their property. By the same token, they had not entered into any prenuptial agreement or other contractual arrangement touching upon the ownership of assets acquired during their marriage.

To this point, the tale would not seem to implicate the taxing power of the United States. But under the Internal Revenue Code (I.R.C.), the Internal Revenue Service (IRS) has a long reach. Its interest here stems from the decedent's purchase, in August of 1997, of 50,000 shares of stock in an American financial services company: Citicorp. These shares were later converted into 125,000 shares of stock in another (related) American company: Citigroup. After a series of stock splits and stock dividends, the investment

grew to a total of 250,000 shares of Citigroup stock.  The value of the shares at the time of the decedent's death was $11,790,000.

A federal estate tax return was due on October 31, 2002. I.R.C. § 6075.  On that day, the Estate filed an application for an extension of time to (i) file a return and (ii) pay any estate tax that was due and owing.  The IRS approved the requested filing extension but not the requested delay in payment.

Nearly two weeks after the deadline for paying estate tax, the Estate paid $1,150,732.33 to the IRS.  The Estate also missed the now-extended deadline for submitting the estate tax return, filing that document on April 29, 2004 (almost one year late).

The estate tax return set the value of the decedent's gross estate for federal estate tax purposes at $4,156,250, which was the value of 125,000 shares of Citigroup stock (one-half of the total bloc of stock held in the decedent's name) on a valuation date permitted by the tax code.[1]  The Estate explained that the gross estate did not include all 250,000 shares because the stock, although issued in the decedent's name alone, was owned as the community property of the decedent and his wife under the laws of Belgium.

---

[1] The tax code affords an executor, in some circumstances, the option of valuing property as of the date six months after the decedent's death.  I.R.C. § 2032.  In this instance, the Estate opted to value the shares as of July 31, 2002.

On June 21, 2004, the IRS assessed unpaid taxes in the amount of $1,156,341.49 against the Estate, together with a penalty of $289,085.37 for the late filing of the return, id. § 6651(a)(1), and a penalty of $7,115.33 for late payment of tax, id. § 6651(a)(2).

After making these assessments, the IRS proceeded to complete its examination of the Estate's tax return. It concluded that all 250,000 shares of Citigroup stock were includable in the gross taxable estate. Accordingly, the IRS issued a notice of deficiency for unpaid tax in the amount of $2,070,000.01. See id. § 6212. The notice also increased the section 6651(a)(1) late-filing penalty by $511,758.93 to reflect the newly assessed tax deficiency.

Having received a demand for payment of both the initial $289,085.37 late-filing penalty and the $7,115.33 late-payment penalty, the Estate sought a waiver of those penalties on the ground that any shortcomings were based on reasonable cause and did not reflect willful neglect. The IRS granted the waiver and abated the penalties.

On July 19, 2007, the Estate repaired to the United States Tax Court. Invoking I.R.C. § 6213, it sought redetermination of the sums claimed in the notice of deficiency. The Estate's petition contained two prayers for relief. First, it contended that the decedent held the shares of Citigroup stock as

community property with his wife under Belgium's marital property regime and, therefore, only one-half of the shares were properly includable in his gross estate. Second, it contended that the $511,758.93 portion of the late-filing penalty should be abated.

The parties submitted the case to the tax court on stipulated facts. See Fed. Tax Ct. R. 122. To explain the fine points of their arguments, they also filed briefs and reports about relevant foreign law. See Fed. Tax Ct. R. 146.

The tax court upheld both the determination of the tax deficiency and the challenged portion of the late-filing penalty. With respect to the former issue, the court concluded that the decedent held the shares not as community property under the marital property regime of Belgium but, rather, as his separate property under the marital property regime of England. Estate of Charania, 2009 WL 2924091, at *8. With respect to the latter issue, the court found insufficient justification for the untimely filing. Id. at *9. Relatedly, it concluded that the IRS's earlier abatement of a portion of the late-filing penalty did not compel the abatement of the remainder of the late-filing penalty. Id. at *9-10. This timely appeal ensued. We have jurisdiction by designation of the parties. I.R.C. § 7482(a), (b)(2); see also Estate of Charania, 2009 WL 2924091, at *4 (noting parties' joint designation of First Circuit).

## II.  ANALYSIS

We bifurcate our discussion of the Estate's claims of error, separately addressing the tax and penalty issues.

### A.  **The Tax**.

Every nonresident decedent who is not a citizen of the United States is subject to federal estate tax on the transfer of certain assets within his taxable estate.  I.R.C. § 2101(a). Pertinently, such a decedent's taxable estate includes stock owned in domestic corporations.  Id. §§ 2104(a), 2106(a).  The dollar amount that is includable in the gross estate is equal to "the value of [the] property to the extent of the interest therein of the decedent at the time of his death."  Id. § 2033.  This calculation may, in certain circumstances, be premised on an alternate valuation date.  Id. § 2032.

The controversy here hinges on a narrow issue.  The Estate does not dispute that Citigroup is a domestic corporation within the meaning of these statutory provisions.  The Commissioner does not contest the Estate's right to use the alternate valuation date.  The parties part ways, however, as to how many of the 250,000 Citigroup shares were includable in the decedent's gross taxable estate.

On this critical issue, the Estate asserts that only one-half of the shares were includable in the decedent's gross taxable estate because, under the marital property regime of Belgium, the

-8-

stock was community property. The Commissioner responds that all the shares were includable in the decedent's gross taxable estate because, under the marital property regime of England, they were the decedent's separate property. This dispute presents a question of foreign law and, thus, the tax court's resolution of it engenders de novo review. See Textron Inc. v. Comm'r, 336 F.3d 26, 30 (1st Cir. 2003); see also Fed. Tax Ct. R. 146 (noting that the tax court's determination of foreign law "shall be treated as a ruling on a question of law").

Even on this compact battlefield, the parties occupy some common ground. They agree that, for federal estate tax purposes, ownership of intangible personal property is controlled by the whole law of the decedent's domicile at the time of death.[2] The parties further agree that the decedent in this case was domiciled in Belgium when he died and that a Belgian court, applying Belgian choice-of-law rules, would look to the whole law of the country of the spouses' common nationality. Finally, the parties agree that

---

[2] We express no opinion on the appropriateness of this conclusion. Rather, we work within the framework to which the parties have agreed. Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (explaining that when parties have reached a plausible agreement about what law governs, a federal court is free to forgo independent choice-of-law analysis and accept the agreement); cf. Restatement (Second) of Conflict of Laws § 187 (explaining that courts generally honor the parties' choice of law selections in contract disputes).

the country of the spouses' common nationality is England.[3]  So framed, the question reduces to what marital property regime an English court would apply to determine the spouses' property rights in the Citigroup shares.

The Estate argues that an English court would adhere to the doctrine of mutability.  Under the doctrine of mutability, the marital property regime of the jurisdiction in which the spouses were domiciled when the property was acquired governs questions of ownership.  J.G. Collier, Conflict of Laws 282 (3d ed. 2001).  In this case, the spouses were living in Belgium when the decedent purchased the stock.  That jurisdiction has a community property regime.  Thus, if an English court were to follow the doctrine of mutability, ownership of the Citigroup shares would be split.

The Commissioner counters that an English court would apply the doctrine of immutability.  Under the doctrine of immutability, the marital property regime of the jurisdiction in which the spouses were domiciled at the time of their marriage governs all personal property that they acquire thereafter, regardless of where they are living when the property is acquired

---

[3] We use "England" as a convenient shorthand for the United Kingdom.  Both the decedent and his wife were born in Uganda, at a time when that country was part of the United Kingdom.  The parties have stipulated that they were citizens of the United Kingdom at all relevant times.

or whether their domicile changes.[4]  Id.  Thus, because the spouses were domiciled at the time of their nuptials in Uganda, and because the parties have stipulated that Uganda's marital property regime corresponded, at the relevant time, to England's marital property regime, the doctrine of immutability would call for application of England's marital property regime.  That is a separate property regime, so that if an English court were to follow the doctrine of immutability, all the Citigroup shares would be the decedent's property.

The question of which jurisdiction's marital property regime should prevail after spouses have changed their domicile is a recurring one in conflict of laws analysis.  In the United States, courts have tended to favor the doctrine of mutability. See, e.g., United States v. ITT Consumer Fin. Corp., 816 F.2d 487, 490 (9th Cir. 1987); Saul v. His Creditors, 5 Mart. (n.s.) 569 (La. 1827).  The primary rationale undergirding this approach is that the jurisdiction in which a couple was domiciled at the time of the acquisition of property has the most significant interest in both the spouses and the property. See Restatement (Second) of Conflict of Laws § 258.  In continental European countries, the doctrine of

_____

[4] We caution that under either the doctrine of immutability or the doctrine of mutability, the situation may vary if the spouses execute a prenuptial or postnuptial agreement, or affirmatively elect to be governed by some other country's marital property regime.  Dicey, Morris & Collins, The Conflict of Laws 1288-1295 (14th ed. 2006).  We do not probe the limits of this exception because nothing of the sort occurred in the case at hand.

immutability is favored.  See Dicey, Morris & Collins, The Conflict of Laws 1295 (14th ed. 2006); Friedrich K. Juenger, Marital Property and the Conflict of Laws, 81 Colum. L. Rev. 1061, 1061-62 (1981).  Champions of the immutability doctrine tout its ease of administration and the desirability of applying a single marital property regime to the entire inventory of a couple's personal property.  See, e.g., Ernest G. Lorenzen, The French Rules of the Conflict of Laws, 38 Yale L.J. 165, 177 (1928); J. Thomas Oldham, What if the Beckhams Move to L.A. and Divorce?, 42 Fam. L.Q. 263, 264-65 (2008).

This background is interesting, but our task is neither to decide which policy rationale is more attractive nor to determine which view is more prevalent across the globe.  Rather, it is our task to inquire which of the competing doctrines an English court would place into service on these facts.  We undertake that inquiry.

Historically, the House of Lords has been the court of last resort in England.[5]  See Appellate Jurisdiction Act 1876, 39 & 40 Vict., c. 59 (Eng.); see also Glenn Dymond, House of Lords Library, The Appellate Jurisdiction of the House of Lords 5-10 (2007).  The only relevant decision of the House of Lords is De Nicols v. Curlier, [1900] A.C. 21 (H.L.) (appeal taken from C.D.).

---

[5] In 2009, the newly created Supreme Court of the United Kingdom assumed that role.  That court has generated no precedent that is relevant here.

-12-

That case involved two French citizens, who married in France. Id. at 23. They did not enter into either a prenuptial agreement or other contractual arrangement relating to the disposition of assets acquired during the marriage. Id.

After nine years, the spouses moved to England, and the husband became a British subject. Id. They spent the next thirty-four years in England, amassing a considerable fortune. Id. at 31. When the husband died, a question arose as to which marital property regime — France's or England's — governed the ownership of the couple's personal property (the bulk of which was acquired after they moved to England). Id. at 23-24.

The De Nicols court looked to the marital property regime of the jurisdiction in which the spouses were domiciled when they celebrated the marriage to determine their rights in each other's personal property. Id. at 24, 31. That brought French law to the forefront, and the court concluded (i) that an immutability rule was baked into French law, and (ii) that law impressed a community property regime on a married couple's rights in personal property. Id. at 24-26. The court considered this immutability rule to be rooted in implied contract theory: under the French Civil Code, entering into a marriage without a prenuptial agreement placed the spouses in the same legal position as if they had executed a contract that expressly adopted the community property regime of the French Civil Code. Id. at 24. Once that regime attached, it

-13-

could not be changed except by the spouses' express agreement to a different arrangement or by the occurrence of certain external events (e.g., divorce).  Id. at 26.  Wielding this reasoning, the court held that the French community property regime governed, even as to property that had been acquired in England.  Id. at 30.

This decision lights our path.  The rule of De Nicols is that a change in marital domicile does not, in itself, effect a change in the marital property regime governing the spouses' rights in personal property acquired throughout the course of the marriage.  This, then, is a clear indication that, in this context, England adheres to the doctrine of immutability.  See Dicey et al. (14th ed.), supra, at 1295.

De Nicols is the only English precedent on point.  It is still good law; it has never been overruled or discredited.  Like the tax court, we are persuaded that we must follow it.  We add that the rule of immutability is also commended to us by the absence of any English precedent suggesting that its obverse — the rule of mutability — applies with respect to the marital property.[6] See Dicey et al. (14th ed.), supra, at 1299 (noting that there is "no English authority" for the proposition that the mutability

---

[6] Lashley v. Hog, (1804) 4 Paton 581 (H.L.), cited by the Estate, is not such a case.  The De Nicols court persuasively distinguished Lashley, explaining that the question in Lashley was not one of marital property rights but, rather, a question of the law of succession.

doctrine may prevail).  Therefore, the rule of immutability applies here.

As part of a campaign to convince us that mutability is the English rule, the Estate points to the eleventh edition of Dicey and Morris's treatise, which states that the English rule governing spouses' rights in each other's property is one of mutability.  <u>See</u> Dicey & Morris, On Conflict of Laws 1068 (11th ed. 1987).  There are two principal reasons why this endeavor fails.

First, even this cited version cautions that whether a mutability rule obtains in England is controversial and not settled law.  <u>Id.</u> at 1069.  Second — and more important — the most recent edition of the same treatise reversed direction and states that immutability is the rule in England.  <u>See</u> Dicey et al. (14th ed.), <u>supra</u>, at 1295 ("Rule 158 — A change in the matrimonial domicile after marriage does not in itself alter the rights of the husband and wife to each other's property.").  The clear import of this about-face is that the authors, having reconsidered the point, now agree that <u>De Nicols</u> heralds a rule of immutability.

Taking a different tack, the Estate tries to distinguish <u>De Nicols</u> on the ground that the <u>De Nicols</u> opinion was driven by French — not English — law.  This theory posits that the result in <u>De Nicols</u> proceeds solely from the fact that French law implied a contract between the spouses to adopt France's marital property regime.  But the text of <u>De Nicols</u> belies this reading.

-15-

Before the De Nicols court gave any consideration to the content of French law, it applied the forum's choice-of-law rules and decided that French substantive law governed the rights of the spouses in each other's property. See [1900] A.C. at 24 ("The parties, as I have said, were married according to French law, and the first thing to do is to see how the matter would be dealt with in respect of such a marriage by French law.") (Halsbury, L.C.); id. at 31 ("[T]he only question would seem to be what was the effect according to French law of the marriage of Mr. and Mrs. De Nicols . . . .") (Lord Macnaghten). The fact that France's choice of a marital property regime could be traced to an implied contract theory had nothing to do with the court's decision, in the first instance, to apply the law of the initial matrimonial domicile. To suggest otherwise is to put the substantive law cart before the choice-of-law horse.

Next, the Estate suggests that, even if De Nicols is not distinguishable and announced a rule of immutability, a modern English court would scrap it and adopt a rule of mutability. This suggestion presents the Estate with a difficult row to hoe. We have indicated, time and again, a reluctance to expand non-federal law to embrace a doctrine that no local court has espoused. See, e.g., A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 7 (1st Cir. 1997) (explaining that federal courts should hesitate to expand a state's law beyond its clearly established boundaries); Kassel v.

-16-

<u>Gannett Co.</u>, 875 F.2d 935, 980 (1st Cir. 1989) (explaining that, when called upon to apply state law, a federal court should normally "take state law as it finds it"). Here the Estate advances three arguments as to why an English court might decline to follow <u>De Nicols</u> in the case at bar. Whether viewed simply or in combination, these arguments do not compel the conclusion that a modern English court would disavow <u>De Nicols</u>.

To begin, the Estate notes that today's society, in contrast to that of a century ago, is characterized by increased longevity and mobility. That is true as far as it goes, but it does not take the Estate very far. One of the chief attractions of the rule of immutability is that it provides a uniform property regime regardless of how long people live or how often they move.

The second purported basis for soughing off <u>De Nicols</u> focuses on the fact that the spouses in <u>De Nicols</u> voluntarily departed from their original marital domicile, whereas the spouses in this case were exiled. But while <u>De Nicols</u> did not speak specifically to the effect (if any) of exile, it is far from clear that an English court would necessarily view this distinction either as meaningful or as cutting in favor of adopting a rule of mutability.

The Estate's final basis for urging us to vaticinate that England's highest court would overrule <u>De Nicols</u> and adopt the mutability rule is no more cogent. This argument posits that a

-17-

mutability rule is needed in order to avoid unfair results.  Here, however, applying the De Nicols rule of immutability would not frustrate any clearly expressed intent of the decedent and his wife.  After all, the decedent took title to the shares in his own name and never altered that form of ownership.  Moreover, the couple had multiple opportunities to select a marital property regime other than that of their original marital domicile, but they eschewed those opportunities.  For example, they could have selected a marital property regime by means of either a prenuptial or postnuptial contract.  See Dicey et al. (14th ed.), supra, at 1285.  Similarly, Belgian law afforded them a mechanism that allowed spouses to switch or modify the marital property regime governing their holdings, see Belgium Code Civil art. 1394 (Codes Larcier, Vol. I, Droit Civil et Judiciaire 2008) (Belg.), but they never invoked that mechanism.

Let us be perfectly clear.  We do not presume to decide that England's highest court, if asked either to reexamine De Nicols or to apply it to somewhat different facts, would necessarily hold firm to the rule of immutability.  That sort of prediction is beyond our proper purview.  We are, however, bound to adhere to the rule of De Nicols absent a compelling showing that the English courts would scuttle that rule.  No such showing has been made here.

To say more on this point would be superogatory. For the reasons elucidated above, we follow <u>De Nicols</u> and apply the rule of immutability in this case. Therefore, the English marital property regime — a regime of separate property — governed the property rights of the decedent and his wife in the Citigroup stock. It follows inexorably that all the shares were includable in the decedent's gross estate for federal estate tax purposes.

## B.  **The Penalty**.

This leaves the Estate's plaint that the tax court erred by upholding the unrescinded portion of the late-filing penalty. To put this plaint into perspective, we chronicle the relevant events.

The IRS assessed a total late-filing penalty of $800,844.30 against the Estate. This penalty was assessed in two stages. First, the IRS assessed a penalty of $289,085.37 shortly after the Estate filed the estate tax return. The IRS then augmented that penalty by assessing an additional $511,758.93 in the notice of deficiency.

The IRS abated the initial portion of the penalty, but did not withdraw the incremental portion of the penalty (added in the notice of deficiency). The tax court refused to abate this incremental portion, <u>Estate of Charania</u>, 2009 WL 2924091, at *10, and the Estate assigns error to this ruling. It asseverates that

because the IRS abated one portion of the late-filing penalty, consistency demanded abatement of the remainder.

In evaluating this asseveration, we start with the text of the relevant statutory provision. We then address the merits of the Estate's claim. Because that claim raises a question of law, our review is de novo. See, e.g., State Police Ass'n of Mass. v. Comm'r, 125 F.3d 1, 3-4 (1st Cir. 1997).

Persons subject to the federal estate tax are required to file estate tax returns within fixed time parameters. I.R.C. § 6075. If such a person fails to file an estate tax return in a timeous manner, he has the burden of showing "that such failure is due to reasonable cause and not due to willful neglect." Id. § 6651(a)(1). In the absence of such a showing, "there shall be added to the amount required to be shown as tax on such return" a late-filing penalty. Id. Imposition of this penalty is mandatory unless the failure to file on time was due to reasonable cause and not due to willful neglect. See Comm'r v. Lane-Wells Co., 321 U.S. 219, 224 (1944) (holding late-filing penalty mandatory, absent reasonable cause, under a similarly worded predecessor statute); Plunkett v. Comm'r, 118 F.2d 644, 649 (1st Cir. 1941) (same).

The amount of the impost is not discretionary but, rather, dictated by the statute. The penalty for returns that are tardy by one month or less is five percent of the amount of tax required to be shown on the return. I.R.C. § 6651(a)(1). An

-20-

additional five percent is added for each further month (or fraction thereof) that elapses before a return is filed. Id. The maximum penalty is twenty-five percent. Id.

In this instance, the Estate filed its return on April 29, 2004 (almost one year late). The IRS responded on June 21, 2004, assessing a late-filing penalty of $289,085.37. This penalty was twenty-five percent of the amount of tax shown on the return — an amount calculated on the assumption that the gross estate included only one-half of the Citigroup shares.

After examination of the return, the IRS determined that all the Citigroup shares were includable in the gross estate. This led to the issuance of a notice of deficiency for additional tax in the amount of $2,070,000.01. The notice also memorialized an increase in the late-filing penalty to correspond with its new tax computation. This added $511,758.93 to the previously assessed late-filing penalty.

After service of the notice of deficiency, the Estate's total tax liability — according to the IRS — stood at $3,226,341.50 (the sum of the $1,156,341.49 tax assessed on June 21, 2004, and the additional $2,070,000.01 assessed by means of the notice of deficiency). The total late-filing penalty stood at $800,844.30 (the sum of the initial portion of the penalty — $289,085.37 — assessed on June 21, 2004, and the incremental portion of the penalty — $511,758.93 — assessed in the notice of deficiency). But

the $289,085.37 portion of the penalty was abated during the administrative phase of this case, leaving the remainder of the penalty ($511,758.93) intact.

The Estate asked the tax court to abate what remained of the late-filing penalty, arguing among other things that the IRS already had determined that reasonable cause existed for the delay in filing and that the delay was not due to willful neglect.

The tax court rejected this argument, Estate of Charania, 2009 WL 2924091, at *9-10, allowing this portion of the penalty to stand.

The tax court's ruling does not survive scrutiny. Although the late-filing penalty was imposed in two stages, it is a single penalty punishing a single default (an untimely filing of the estate tax return). The entire penalty was assessed in pursuance of section 6651(a)(1). Under that statute, unless the IRS determines that a taxpayer has demonstrated both reasonable cause for the delay in filing and an absence of willful neglect, the IRS must assess a late-filing penalty. The IRS abated the initial portion of the penalty. This action necessarily signified that it had determined that reasonable cause existed for the late filing and that the failure to file on time was not due to willful neglect. See I.R.C. § 6651(a)(1). On the face of the matter, these determinations would seem to apply equally to the remainder of the penalty (which was calculated according to the same

statutory algorithm and imposed for precisely the same late filing). The Commissioner has pointed to no basis for treating one portion of this unitary penalty differently from the other, and the record suggests no such distinction.

The whole is but the sum of its parts, and logically, the two portions of the late-filing penalty should stand or fall together. There may be special circumstances that would justify splitting the baby, but the Commissioner has the burden of identifying those circumstances. Cf. Estate of Abraham v. Comm'r, 408 F.3d 26, 35 (1st Cir. 2005) (holding that where notice of deficiency fails adequately to describe the basis on which the Commissioner relies for his deficiency determination, burden shifts to the Commissioner to prove the accuracy of the deficiency determination). Absent a plausible explanation, the only conclusion that can be drawn from the abatement of the initial portion of the penalty is that the remainder of the penalty should have been abated as well. Any other result would be arbitrary, capricious, and in derogation of the government's duty to turn square corners in dealing with taxpayers. See Rotolo v. Merit Sys. Protection Bd., 636 F.2d 6, 8 (1st Cir. 1980).

Here, the Commissioner has not proffered a plausible explanation that would justify the apparent aberration. Without such an explanation, we are constrained to conclude that the tax

-23-

court erred in refusing to abate the balance of the late-filing penalty.[7]

## III.  CONCLUSION

We need go no further.  We affirm the tax court's ruling that all 250,000 Citigroup shares were the separate property of the decedent for federal estate tax purposes and, thus, were includable in his gross taxable estate.  Accordingly, the amount of tax claimed in the notice of deficiency was due.  Nevertheless, the tax court's approbation of the $511,758.93 late-filing penalty was in error, and that ruling must be reversed.

**<u>Affirmed in part and reversed in part</u>**.

_____

[7]  Simple arithmetic confirms this conclusion.  After completion of the IRS's examination of the return, the total amount of estate tax due was $3,226,341.50.  Under section 6651(a)(1)'s algorithm for a return that is filed more than eleven months late, the late-filing penalty is twenty-five percent of that amount. That amount is fixed by the statute, and the Commissioner has no discretion to vary it.  A late-filing penalty of $511,758.93, however, would represent approximately sixteen percent of the tax due.  Thus, the statutory formula does not allow for a stand-alone late-filing penalty of $511,759.93.