C. BEAN LUMBER TRANSPORT, INC., Plaintiff,

v.

UNITED STATES OF AMERICA, Defendant.

No. 98–6052.

United States District Court, W.D. Arkansas, Hot Springs Division.

March 1, 1999.

Mr. James Allen Brown, Little Rock, AR, for plaintiff.

Mr. Andrew Pribe, United States Department of Justice, Washington, DC, for defendant.

### MEMORANDUM OPINION

DAWSON, District Judge.

This taxpayer refund action is before the court on the defendant's motion for partial summary judgment. Specifically, the United States has moved for summary judgment on the issue of whether plaintiff's purchase of new trucks, and sales of used trucks, constitute purchase and sale transactions on which a gain or loss should be recognized rather than non-taxable exchanges of like-kind property under 26 U.S.C. § 1031.

### Background.

The facts in this case are undisputed. C. Bean Lumber Transport, Inc. (Bean), is an Arkansas corporation with its principal place of business in Amity, Arkansas.

Bean is a trucking company that hauls freight throughout the United States.

During the period from August 1, 1992, through July 31, 1994, Bean purchased approximately 175 new Freightliners from Texarkana Truck Center (TTC), a Freightliner dealership, located in Texarkana, Texas. *Government's Exhibit* 3. The negotiations for the purchase of the new Freightliners and the trade-in or sale of the used Freightliners were handled by Borden Bell, Jr. (Bell), owner and operator of TTC, and Curt Bean (C. Bean), vice-president and principal stockholder of Bean.

Generally, the purchase price of these trucks was financed 100% through third-party finance companies. *Bell Deposition at* 16. The financing documents do not contain any trade-in credit. *See e.g., Government's Exhibit* 5. During the same period, Bean sold or "traded-in" approximately 107 trucks to TTC. *Government's Exhibit* 3.

When Bean decided to purchase new trucks, it would order the trucks meeting its specifications. *Bell Deposition* at 13–14. When a properly configured truck was selected, the truck would be priced. *Id.* Because Bean was one of TTC's better customers and purchased in quantity, Bean got a better price on the new trucks because the factory would give a discount based on the number of vehicles being purchased. *Id.* at 33. TTC passed this discount onto Bean. *Id.* Additionally, on trade-ins, Bean was given the high-end value. *Id.* at 32–33.

At the time Bean ordered new trucks, Bell and C. Bean would also talk about the value of the trucks being traded-in and approximately when TTC could expect to receive the trucks being traded-in. *Id.* at 14. According to Bell, in

the vocabulary of the industry [this] is known as a roll out, a roll out would mean if you traded me your trucks in May, 99, I am going to give you this much money, if you give them to me in

June I am going to give you a lesser amount of money. In July a lesser amount of money, August a lesser amount of money, etc., through the end of the transaction.

*Id.*

When asked to focus on the trading in, Bell, described the process as follows:

During the pricing of the transaction, we haven't received the order yet, we haven't built the new truck yet, during the pricing of the transaction, when we are coming to an agreement on what we are going to sell the new truck for, we are also discussing how much he will be allowed for those trade-ins and how many there will be and about when we will receive them. Then we do what we referred to earlier as a roll out provision, and let's use an example, and I think it is a good one because Mr. Bean generally likes to take new trucks starting in May, not always, but generally. We would tell him how much trade-in value he had, we would need to know what he is going to trade and sometimes it is exactly the same truck and the same year model, sometime like this year he has got a few 95's left and he has also got 96's so we have to have them both broken out, which division they are coming out of, how many miles are going to be on the vehicles and what we are willing to give him on trade-in on those trucks, by month, depending on when he gives them to us. And that is put in writing and he knows and we know that if he turns it in in May he, let's use an example, he may get forty-eight thousand for it, he turns it in in June or July he may get forty-seven thousand for it. And he has the option to, depending on how strong his freight is, how many drivers availability he has, he may elect, he pick up ten new trucks in May, but we may not get those ten trades in May. He may elect to wait to give them to us at a different date and maybe at a lower price. So all of that is worked out on the front end before the new trucks are ever ordered. We are generally talking a lot of new trucks.

And he prefers to know how much he is going to get for those trade-ins, based on which month he turns them in, versus some customers with a lesser amount, we may not can tell him what we will give him for his trucks next May.

*Id.* at 18–20.

Typically, there was a short time difference between the time TTC sells the new Freightliners and the time TTC receives the old trucks for trade-in. *Bell Affidavit.* Because of this, the company records might show the trade-ins as separate transactions but Bell regarded the transactions as package deals. *Id.* In his words, "[t]he transactions were inter-related the agreements were reached only after an acceptable amount had been determined for both the selling price and the trade-in price. These transaction were reciprocal and mutually dependent transactions even though the transactions were recorded separately on our books." *Id. See also Affidavit of Curt Bean* (Transactions were shown as separate transactions of sales and purchases).

Once the agreement was reached, in Bell's opinion TTC was committed to taking those trucks and Bean was committed to giving them to TTC. *Bell Deposition* at 26. For the last seven or eight years, Bean has purchased more new trucks each year than it has traded in. *Id.* at 27.

After an agreement was reached, Bell would prepare a memorandum which set forth the terms of the agreement. *Bell Deposition* at 28–29. A copy of the memorandum was always furnished to Bean. *C. Bean Affidavit.* "The used trucks to be traded in were identified by make, year and model to an extent sufficient for Mr. Bell to calculate a trade in value for the used trucks in his memorandum." *Bean Affidavit.*

According to Bell, Bean does not ever sell trucks to TTC instead he trades the trucks. *Id.* at 22. The purchase price of the used trucks was based upon market considerations. In most cases, TTC pur-

chased the trucks from Bean by preparing two checks. *Bell Deposition at* 24–25. One check would be made payable to a financing company to retire any debt on the vehicle traded in. *Government's Exhibit 3 & Bell Deposition at* 24. The second check was made payable to Bean and represented Bean's equity in the truck. *Id.* No restrictions were imposed by TTC or the financing companies on Bean's use of the funds it obtained from the sale of the used trucks. *Bell Deposition at* 25–26.

Bean contends these transactions constituted a like-kind exchange within the meaning of § 1031. The United States contends these transactions were separate transactions not within the scope of § 1031.

For the tax years in question, the years ending July 31, 1993, and July 31, 1994, Bean on September 25, 1995, filed a refund claim on Form 1120X. The claims were based on Bean's treating the purchase and sale of the Freightliners as like-kind exchanges. The IRS disallowed the claims.

Bean filed this action on May 8, 1998, seeking a refund of federal income tax for the tax years ending July 31, 1993, in the amount of $189,530 and July 31, 1994, in the amount of $125,739. Bean contends the sale and purchase of trucks from TTC qualify for application of the like-kind exchange rules under 26 U.S.C. § 1031. A portion of the refund sought for the tax year ending July 31, 1994, is premised on a claim to a greater deduction than that allowed by the Internal Revenue Service (IRS) for certain per diem payments made to drivers during that year. This latter claim is not addressed in this summary judgment motion.

### Summary Judgment Standard.

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 609–10 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 610 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985)).

### Discussion.

The United States has now moved for summary judgment contending Bean is not entitled to claim a deduction for the purported exchange of trucks under § 1031. In general, the gain or loss on the sale or exchange of property is taxable. *See* 26 U.S.C. § 1001. One exception to this rule is § 1031 which provides for the nonrecognition of gain or loss in the case of like-kind exchanges of property held for productive use in a trade or business or for investment. *See* 26 U.S.C. § 1031. "The legislative intent underlying § 1031 was that taxpayers should be permitted to avoid present tax liability when exchanging one property for another of like-kind since taxes should not be imposed on a realized gain where the taxpayer maintained a continuity of investment in like-kind property." *Ravenswood Group v. Fairmont Associates*, 736 F.Supp. 1285, 1287 (S.D.N.Y. 1990).

For a property transfer to qualify as a like-kind exchange within the meaning of

§ 1031, three requirements must be met: (1) there must be an exchange; (2) the properties exchanged must be of a like-kind; and (3) the property transferred and the property received must be held by the taxpayer for productive use in a trade or business, or for investment. 26 U.S.C. § 1031(a).

The United States contends the transactions at issue are not covered by § 1031 for two reasons. First, the United States argues the transactions were not reciprocal and mutually dependent. Conceding that a transaction may not be separated into its component parts for tax purposes, the United States nevertheless argues the purchases of new trucks and sales of used trucks were not reciprocal and certainly not mutually dependent.

It contends Bean was bound to purchase the new trucks but was not bound to sell its used trucks to TTC. It points out that no formal contract existed between Bean and TTC obligating Bean to sell its used trucks to TTC and the "roll out" documents did not require Bean to deliver the used trucks at a specific time, were not signed by an agent of Bean, and did not specify any particular used trucks. Further, the United States points out TTC was not obligated to pay the price listed on the roll out document but instead might deduct amounts depending on the quality of the truck received.

Second, the United States contends the receipt of money precludes the application of the like-kind exchange rules. Here, the United States points out Bean financed 100% of the purchase price of the new property and received cash for the old property.

In opposition, Bean argues that the transactions were reciprocal and mutually dependent. It points out that both TTC and it regarded the transactions as package deals and that the purchase and trade-ins were merely steps in the overall deal. Further, Bean argues the mere fact it received some cash as a result of the deal does not mean these were not like-kind exchanges. In Bean's view, the only

issues to be resolved in this case are whether or not the time lapse between the purchase and trade-in and the separate treatment on the books and records disqualifies these transactions as tax free exchanges.

 "In general, the 'incidence of taxation depends upon the substance of a transaction' rather than its mere form." *Cal–Maine Foods, Inc. v. Commissioner of Internal Revenue*, 93 T.C. 181, 197, 1989 WL 87697 (1989). While a "taxpayer has the right to minimize taxes as far as the law allows, . . . a taxpayer ordinarily may not through form alone achieve tax advantages which substantively are without the intent of the statute." *Id.* (citations omitted).

Revenue Ruling 61–119, on which Bean relies heavily, addressed the question of whether a § 1031 like-kind exchange occurred:

> Where a taxpayer sells old equipment used in his trade or business to a dealer and purchases new equipment of like kind from the dealer under circumstances which indicate that the sale and the purchase are reciprocal and mutually dependent transactions, the sale and purchase is in exchange of property within the meaning of section 1031 of the Internal Revenue Code of 1954, even though the sale and purchase are accomplished by separately executed contracts and are treated as unrelated transactions by the taxpayer and the dealer for record keeping purposes.

Rev.Rul. 61–119, 1961–1 C.B. 395, 1961 WL 12653.

It was noted that:

> [t]he recognition to be accorded a particular transaction for Federal income tax purposes depends upon the substance of the transaction rather than the form in which it is cast. . . . The courts have held that a sale is to be disregarded where it is a step in a transaction the purpose of which is to make the exchange, and which results in an exchange.

The conclusion was that:

the sale of the used equipment and the purchase of the new equipment are reciprocal and mutually dependent transactions. The taxpayer's acquisition of the new equipment from the dealer is contingent upon the dealer taking his used equipment and granting a trade-in allowance equal to or in excess of its fair market value. Moreover, the dealer's accepta[nce] of the old equipment is dependent upon the taxpayer's purchase of the new equipment. Under these circumstances, the transfer of the old equipment to the dealer, irrespective of the form or the technique through which the transfer is accomplished, represents but a step in a single integrated transaction.

Accordingly, it is held that the transfer of old equipment to the dealer and purchase of the new equipment from him is a nontaxable expense under section 1031 of the Code, even though the purchaser and the seller execute separate contracts and treat the purchase and sale as unrelated transactions for record keeping purposes.

*Id. See Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 657 (5th Cir.1968) (Although Revenue Ruling 61–119 does not have the force and effect of law, it is a persuasive interpretation of the Code and Regulations).

■ "If a transaction is considered a sale and purchase rather than an exchange, the taxpayer's future basis for depreciation is the actual cost of the new trucks." *Bell Lines, Inc. v. United States*, 480 F.2d 710, 711 (4th Cir.1973). If an exchange occurs, the taxpayer uses for depreciation purposes a transferred basis. *Id.* at 712.

In *Redwing*, the taxpayer, Redwing Carriers, was engaged in the business of hauling bulk commodities as a common carrier. Trucksales, Inc., was a wholly owned subsidiary of Redwing which engaged in the business of selling trucks and was a franchised dealer for G.M.C. trucks. In 1958 Trucksales purchased twenty-eight new

G.M.C. diesel tractor trucks from G.M.C. for cash. At about the same time, Redwing transferred title to twenty-seven used trucks to G.M.C. for cash. *Id.* at 655. In 1959 and 1961 similar transactions occurred.

Mendez, who handled all the negotiations for the transactions, insisted on the purchases of new equipment and trade-ins being cast in the form of separate purchases of the new and sales of the old trucks. *Id.* at 655. The price G.M.C. paid for the used trucks was in excess of their fair market value and it made a profit only by viewing the purchases of used trucks and sales of new trucks as one transaction. *Id.* at 655.

Redwing for tax purposes considered the transactions separate "in order to recognize an immediate gain at capital gains rates and concomitantly to take a larger depreciation deduction from ordinary income." *Id.* at 654. The court held that the "buying and selling were synchronous parts meshed into the same transaction and not independent transactions." *Id.* at 656. It concluded Redwing's transactions were "brought directly within the ambit of Section 1031" which "requires the nonrecognition of gain or loss in transactions when in theory the taxpayer may have realized gain or loss, but in substance his economic interest in the property has remained virtually unchanged by the transaction." *Id.* at 656.

■ After careful consideration, we conclude the transactions at issue in this case do not, as a matter of law, qualify as like-kind exchanges. This conclusion is based on a number of factors. The intent of § 1031 "was that taxpayers should be permitted to avoid present tax liability when exchanging one property for another of like-kind since taxes should not be imposed on a realized gain where the taxpayer maintained a continuity of investment in like-kind property." *Ravenswood Group*, 736 F.Supp. at 1287. In this case, there has been no evidence that the cash received by Bean for the used trucks was

applied in any way to the financed debt on the new vehicles.

 Although the receipt of cash does not automatically disqualify a transaction from being considered a like-kind exchange, we believe the unrestricted receipt of cash in this case does disqualify the transactions. The proceeds from the "traded-in" vehicles was not reinvested. Nor was this the typical case in which cash was given to equalize the value of the assets exchanged, *i.e.*, in a typical trade-in the buyer would pay the difference between the value of the new vehicle and the value of the vehicle traded-in.

 What Bean did here was convert the old trucks to cash. A like-kind exchange is basically the equivalent of a sale of property for cash combined with a reinvestment of such cash in other property of like-kind. In the transactions at issue here, Bean purchased new trucks, financed their purchase 100%, sold old trucks, received cash for its equity, and spent the cash on whatever it wanted. Thus in substance, the old trucks were converted to cash rather than exchanged. Any gain realized by Bean by these sales was not deferred and should be taxed.

Next, we believe Bean's reliance on Revenue Ruling 61–119 and *Redwing* is misplaced. We believe an important distinguishing factor is that in this case Bean is converting its investment in the used trucks into cash. Further in *Redwing,* G.M.C. made a profit only if the transactions were viewed as one transaction. G.M.C. paid Redwing in excess of the fair market value for the used vehicles. In contrast, TTC made a profit on both sides of the transaction. Bean received a discount on the purchasing end only because the discount was passed on from the factory. On the used vehicle end, Bean received only fair market value, albeit the high end of range.

### Conclusion.

For the reasons stated, defendant's motion for partial summary judgment will be granted by a separate order entered concurrently herewith.