T.C. Memo. 2010-182


UNITED STATES TAX COURT


ESTATE OF MARIE J. JENSEN, DECEASED,
VIRGINIA E. MAURER, EXECUTRIX, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25681-08.                     Filed August 10, 2010.


Jack Mitnick and Mindy K. Smolevitz, for petitioner.

Michelle L. Maniscalco, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined a $333,244.59 deficiency in the Federal estate tax of the Estate of Marie J. Jensen (decedent).  The issue for decision is the amount of the discount for built-in long-term capital gains tax (LTCG tax) that is allowable in computing the fair market value of the estate's

interest in Wa-Klo, Inc (Wa-Klo).  The parties agree that:
(1) Wa-Klo's net asset value is $3,772,176[1] before reductions for lack of marketability and built-in LTCG tax discounts; (2) the estimated Federal built-in LTCG tax liability is $965,000; and (3) the estate is entitled to a 5-percent reduction for lack of marketability discount.  Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate by this reference the stipulation of facts and the attached exhibits.

Decedent was a resident of New York when she died on July 31, 2005.  When the petition was filed, Virginia E. Maurer (executrix) resided in New York.

In February 2003 decedent created the Marie J. Jensen Revocable Trust, a revocable trust (the trust), and appointed herself trustee.  As of decedent's death, the corpus of the trust

---

[1]  The parties stipulated pursuant to Rule 91 that Wa-Klo's net asset value was $4,243,969.  Respondent's expert, Klaris, Thomson, & Schroeder, Inc. (KTS), discovered that the estate's expert, Margolin, Winer, & Evens LLP (MWE), overstated Wa-Klo's net asset value by $471,793.  The parties on brief agree that $3,772,176 is the correct value, which we accept.

included 164 shares of common stock in Wa-Klo,[2] a closely held C corporation incorporated in 1956 under New Hampshire law.

As of the date of decedent's death Wa-Klo's principal asset was a 94-acre waterfront parcel of real estate that extended across the city lines of Jaffrey and Dublin, New Hampshire. The improvements to the real estate include state-of-the-art facilities such as playing fields, an indoor gymnasium, a horse stable, a dining hall, cottages, and bunkhouses. Wa-Klo operates a summer camp for girls, Camp Wa-Klo, on the real estate.

The estate hired MWE, see supra note 1, to value the estate's 82-percent interest in Wa-Klo as of the date of decedent's death. MWE used the adjusted book value method[3] and attributed to Wa-Klo a net asset value of $4,243,969 (before

---

[2] The shares of Wa-Klo were held as follows: (1) The trust--164 shares (82-percent interest); (2) Ina Fletcher--18 shares (9-percent interest); and (3) Kathleen Cocoman--18 shares (9-percent interest).

[3] Generally, three kinds of valuation methods are used to determine the fair market value (FMV) of stock in a closely held corporation: (1) The market method; (2) the income method; and (3) the cost method. See Estate of Noble v. Commissioner, T.C. Memo. 2005-2; Estate of Borgatello v. Commissioner, T.C. Memo. 2000-264. The adjusted book value method is a variation of the cost method that restates the assets and liabilities of a company to their FMV as of the valuation date and reduces the restated FMV of the assets by the restated value of the liabilities in order to determine the company's net worth. See Julian v. Julian, No. 1892-VCP, slip op. at 5 n.13 (Del Ch. Mar. 22, 2010); Shooltz v. Shooltz, 498 S.E.2d 437, 443 (Va. Ct. App. 1998).

discounts for lack of marketability and built-in LTCG tax).[4] MWE estimated a built-in LTCG tax of $965,000.[5] MWE subtracted the $965,000 built-in LTCG tax from the $4,243,969 net asset value and calculated a $3,278,969 after-tax net asset value for Wa-Klo,

---

[4] MWE based its valuation on the following:

| Assets | Book value | Restated value |
|---|---|---|
| Cash | $934,973 | $934,973 |
| Salary advances | 22,932 | 22,932 |
| Federal prepaid tax | 27,032 | 27,032 |
| State prepaid tax | 10,047 | 10,047 |
| Real estate, buildings, and other depreciable assets | 471,793 | [1]3,776,793 |
| Total | 1,466,777 | 4,771,777 |

| Liabilities | | |
|---|---|---|
| Payroll tax payable | $2,808 | $2,808 |
| Accrued liabilities | -0- | 525,000 |
| Total | 2,808 | 527,808 |

| Equity | $1,463,969 | $4,243,969 |
|---|---|---|

[1] $3,300,000 (restated FMV of the real estate and improvements based on appraisal by Whitney Associates) + $5,000 (estimated salvage value of equipment) + $471,793 (MWE math error, see supra note 1). MWE relied on Whitney Associates' appraisal of the real estate and its improvements. Whitney Associates is a residential and commercial real estate appraiser. The estate hired Whitney Associates to appraise the real estate and its improvements. Whitney Associates employed a cost method and a market method. Under the cost method it calculated a value of $3,600,000; under the market method it calculated a value of $3 million. Whitney Associates reconciled the two values on the basis of a number of factors and calculated a final value of $3,300,000. Whitney Associates did not use an income method because it concluded that it was unreliable and not an applicable method for the purpose of the appraisal.

[5] $3,300,000 (FMV real estate) - $500,000 (estimated tax basis) x 34% (tax rate) + $13,000 (tax increase for income over $100,000). The estate on brief now asserts that it is entitled to a discount of $1,133,283 for State and Federal tax.

of which $2,688,755 was attributable to the estate's 82-percent interest (before discount for lack of marketability).  MWE concluded that a dollar-for-dollar discount for the built-in LTCG tax was appropriate because:

> The adjusted book value method is based on the inherent assumption that the assets will be liquidated, which automatically gives rise to a tax liability predicated upon the built-in capital gains that result from appreciation in the assets.  This was clearly recognized in the decision of the United States Court of Appeals for the Fifth Circuit in the case of the Estate of Dunn v. Commissioner, * * * [which allowed a 34-percent discount].  [Citation omitted.]

MWE did not use any income methods to value the estate's interest in Wa-Klo because it concluded that:  (1) Wa-Klo did not generate substantial cashflows from its operation of Camp Wa-Klo; (2) the best use of Wa-Klo could be derived from a sale of its assets because its operating performance declined in fiscal years 2004 and 2005 and because the "profitability benchmark" for summer camps with revenues below $1 million was only 5.3 percent; (3) Wa-Klo's value was driven by the appreciated value of its assets; and (4) the estate's 82-percent interest in Wa-Klo was a controlling interest.

MWE did not use any market methods to value the estate's 82-percent interest in Wa-Klo because it concluded that:  (1) Wa-Klo owned a specific asset, appreciated real estate, that had a

specific appraised value; and (2) the market method was incorporated into Whitney Associates' appraisal of the real estate.

As of the date of decedent's death, neither a sale or liquidation of Wa-Klo nor a sale of its assets was imminent or planned. There is no evidence in the record of any arm's-length sale of Wa-Klo's common stock near the date of decedent's death.

The executrix filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. The executrix initially reported a value of $2,600,000 for the estate's 82-percent interest in Wa-Klo (after discounts for lack of marketability and built-in LTCG tax) based on MWE's appraisal. The executrix filed an amended Form 706 and reduced the value of the estate's interest in Wa-Klo to $2,554,317, reporting a total taxable estate of $4,296,449 and a Federal estate tax liability of $1,306,736.

Respondent examined the amended Form 706 and determined a value of $3,268,465 for the estate's interest in Wa-Klo (after a discount for lack of marketability of 5 percent and a discount of $250,042[6] for built-in LTCG tax). He determined the estate tax deficiency of $333,244.59 and sent the executrix a notice of deficiency.

---

[6] There is no evidence in the record as to how respondent determined the $250,042 discount for built-in LTCG tax.

Respondent's expert, KTS, like the estate's expert, used a cost method to value the estate's interest in Wa-Klo. Using the financial statements prepared by MWE, KTS also calculated Wa-Klo's net asset value at $4,243,969 (before discounts for lack of marketability and built-in LTCG tax).

KTS then analyzed data for other investments that have exposure to built-in capital gains to determine the discount for the built-in LTCG tax. Specifically, KTS undertook to measure the amount by which the built-in LTCG tax exposure of each of six closed-end funds[7] depressed the value of the closed-end funds in relation to their net asset values. As shown in the table infra note 8, KTS found that the built-in capital gains exposure for those six closed-end funds ranged from 10.7 to 41.5 percent. KTS also found that two of the closed-end funds with high built-in capital gains exposure, Royce Value Trust and Gabelli Equity Trust, were selling at a premium to net asset value, while the closed-end fund with the least built-in capital gains exposure, Tri-Continental Corp., was selling at the highest discount from net asset value. On the basis of those findings, KTS concluded that it was "unable to find a direct correlation, at least up to

---

[7] A closed-end fund is a type of investment company with the following characteristics: (1) Not continuously offered; (2) secondary market pricing; (3) not redeemable; (4) trading during the day; and (5) greater illiquidity. See Moriarty & McNeily, Closed-End Mutual Funds, 19 Reg. Fin. Pl. § 3:422 (May 2010).

41.5 percent of net asset value, between higher exposure to built-in capital gains tax and discounts from net asset value" among the six closed-end funds that it examined.[8]

KTS also compared closed-end funds that primarily hold real estate investments with those that hold non-real-estate financial securities. As shown in the table infra note 9, KTS found, as between those two categories of funds, that the discounts from net asset value were generally larger for closed-end funds that primarily held real estate investments.[9]

---

[8] KTS' analysis was based on the following six closed-end funds:

| Fund | Net asset value | Stock price | Percent difference | Percent unrealized investment appreciation |
|------|-----------------|-------------|--------------------|--------------------------------------------|
| Adams Express | 15.49 | 13.29 | -14.20 | 25.8 |
| Gabelli Equity Trust | 8.83 | 9.07 | .72 | 26.2 |
| General American Investors | 39.32 | 34.18 | -13.10 | 41.5 |
| Liberty All-Star Equities | 9.06 | 9.5 | 4.90 | 13.8 |
| Royce Value Trust | 19.02 | 20.15 | 5.90 | 36.7 |
| Tri-Continental Corp. | 22.02 | 18.46 | -16.20 | 10.7 |

[9] KTS calculated the following range of values:

(continued...)

KTS divided the $2,800,000 value of Wa-Klo's real estate and its improvements (net of basis) by Wa-Klo's $4,243,969 net asset value and concluded that 66 percent of that net asset value was subject to tax at the corporate and shareholder levels. KTS concluded that with a built-in capital gain equal to 66 percent of Wa-Klo's net asset value, a discount would be considered by a prudent willing buyer. KTS opined that since it could not find, from its examination of the closed-end funds listed supra note 8, any direct correlation between exposure to built-in capital gains tax and discounts from net asset value at levels of exposure of 41.5 percent or less, KTS could not conclude that any consideration should be given for Wa-Klo's built-in LTCG tax exposure up to 41.5 percent of its net asset value. But KTS opined that full consideration (i.e., a dollar-for-dollar discount) should be given for Wa-Klo's built-in LTCG tax exposure above 41.5 percent.

KTS found that the portion of Wa-Klo's exposure to built-in LTCG tax in excess of 41.5 percent of net asset value was 24.5

---

[9](...continued)

| Percent discount from net asset value | Specialized equity funds | Specialized equity funds holding real estate |
|---|---|---|
| Minimum | -16.0 | -16.8 |
| Mean | -6.1 | -14.8 |
| Median | -8.9 | -15.2 |
| Maximum | 32.5 | -10.8 |
| Fund count | 30 | 11 |

percent (66% - 41.5%).  KTS multiplied 24.5 percent by Wa-Klo's $4,243,969 net asset value for a total of $1,039,772.  KTS applied a combined State and Federal tax rate of 40 percent  and calculated a combined tax liability of $415,909 (40% x $1,039,772), which it concluded was 9.8 percent of Wa-Klo's $4,243,969 net asset value ($415,909 ÷ $4,243,969).

KTS concluded that the estate was entitled to a discount of 10 percent (i.e., $424,397, about 45 percent of the built-in LTCG tax).  KTS reasoned that a 10-percent discount was supported by the fact that the difference in the mean or average discount between closed-end funds with investments in real estate and those with investments in marketable securities was 8.7 percent (14.8% - 6.1%) or 9 percent rounded.  See supra note 9.

KTS also opined in its report that generally there are methods to avoid paying the built-in LTCG tax by engaging in a section 1031 like-kind exchange or by converting a C corporation to an S corporation.  It also acknowledged that there are certain limits to avoidance.  For example, a like-kind exchange "limits the properties which may be acquired to those whose owner also [wished] to make" an exchange, and conversion to S corporation status requires a 10-year holding period before the potential tax liability would be eliminated.  KTS did not, however, discuss in its report whether a like-kind exchange or conversion to S

corporation status was a viable method for a hypothetical purchaser of the estate's Wa-Klo stock.

At trial, KTS discovered that the adjusted balance sheet prepared by MWE incorrectly listed the restated value for the land, buildings, and salvage value of the equipment as $3,776,793 whereas the correct value was $3,305,000. See supra note 1. Accordingly, KTS opined that Wa-Klo's correct net asset value was $3,772,176 and calculated a revised discount of 13 percent for the built-in LTCG tax (i.e., $490,382.88 (about 50 percent of the built-in LTCG tax)). Respondent on brief asserts the correct discount for the built-in LTCG tax attributable to the estate's 82-percent interest in Wa-Klo is about $402,114 ($490,383 x 82%).

OPINION

I. Burden of Proof

As a general rule, a notice of deficiency is entitled to a presumption of correctness, and the taxpayer bears the burden of proving the Commissioner's deficiency determinations incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 7491(a), however, provides that if a taxpayer introduces credible evidence and meets certain other prerequisites, the Commissioner shall bear the burden of proof with respect to

factual issues[10] relating to the taxpayer's liability for a tax imposed under subtitle A or B of the Code.

Our conclusions are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

## II. FMV of the Estate's 82-Percent Interest in Wa-Klo

### A. General Principles

Property includable in the value of a decedent's gross estate is to be valued as of the date of the decedent's death. Sec. 2031(a). For purposes of the estate tax, property value is determined by finding the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts. Sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and willing seller are hypothetical persons. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Bright v. United States, 658 F.2d 999, 1006 (5th Cir. 1981)). The hypothetical buyer and seller are presumed to be dedicated to

---

[10] Valuation is a factual determination, and the trier of fact must weigh all relevant evidence and draw appropriate inferences. Estate of Deputy v. Commissioner, T.C. Memo. 2003-176.

achieving the maximum economic advantage.  Id. (citing Estate of Curry v. United States, 706 F.2d 1424, 1429 (7th Cir. 1983)).

B.  Expert Opinions Generally

Each party relies on an expert opinion to determine the discount for built-in LTCG tax that the estate is entitled to. In deciding valuation cases, courts often look to the opinions of expert witnesses.  We evaluate expert opinions in the light of all the evidence in the record, and we are not bound by the opinion of any expert witness.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Shepherd v. Commissioner, 115 T.C. 376, 390 (2000), affd. 283 F.3d 1258 (11th Cir. 2002).  The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based.  Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).  We may reject, in whole or in part, any expert opinion.  See id.  Because valuation necessarily involves an approximation, the figure at which we arrive need not be directly traceable to specific testimony or a specific expert opinion if it is within the range of values that may be properly derived from consideration of all the evidence. Estate of True v. Commissioner, T.C. Memo. 2001-167, affd. 390 F.3d 1210 (10th Cir. 2004) (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285).

C.  The Estate's Arguments

The estate raises the following arguments against respondent's valuation.  First, the estate argues that it is entitled to a 100-percent discount (i.e., $1,133,283), or something very close thereto, for the built-in LTCG tax pursuant to the Court of Appeals for the Second Circuit's decision in Eisenberg v. Commissioner, 155 F.3d 50 (2d Cir. 1998), vacating T.C. Memo. 1997-483.[11]  Second, according to the estate, if given the opportunity to review the discount for built-in capital gains tax issue again, that court would consider the recent decisions in Estate of Dunn v. Commissioner, 301 F.3d 339 (5th Cir. 2002), revg. T.C. Memo. 2000-12, and Estate of Jelke v. Commissioner, 507 F.3d 1317 (11th Cir. 2007), vacating T.C. Memo. 2005-131, which allowed discounts for the built-in LTCG tax in full, and might adopt the approach of those courts.  Third, the estate argues that respondent's expert's reliance on closed-end funds to determine the discount for the built-in LTCG tax is misplaced.  Finally, the estate argues that respondent's reliance on alternate methods, such as a section 1031 like-kind exchange, to avoid or defer payment of the built-in LTCG tax is also

---

[11]  Under the Golsen rule, we follow the law of the circuit in which the case is appealable, here the Second Circuit.  See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

misplaced.  Naturally, respondent has asserted arguments to the contrary.  We now turn to analyzing the parties' contentions.

1.  Built-In LTCG Tax Generally

The General Utilities doctrine,[12] as codified in former sections 336 and 337, allowed the tax-free liquidation of a corporation, and thus, the complete avoidance of corporate-level capital gains.  See Eisenberg v. Commissioner, supra at 54-55. Before the General Utilities doctrine was repealed in the Tax Reform Act of 1986, Pub. L. 99-514, sec. 631, 100 Stat. 2269, we consistently rejected taxpayers' attempts to discount a corporation's value on the basis of any inherent capital gain tax liability.  We noted that the liability could be avoided at the corporate level by employing that doctrine.  See, e.g., Estate of Piper v. Commissioner, 72 T.C. 1062, 1087 n.27 (1979).  In Estate of Davis v. Commissioner, supra, however, we allowed a discount for the built-in LTCG tax liability on the basis of the facts and circumstances.[13]

---

[12]  The General Utilities doctrine originated in General Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935).

[13]  Since Estate of Davis v. Commissioner, 110 T.C. 530 (1998), we have frequently applied a present-value approach based on all the facts and circumstances in subsequent valuation cases to determine the taxpayer's discount for the built-in LTCG tax liability.  See Estate of Litchfield v. Commissioner, T.C. Memo. 2009-21; Estate of Jelke v. Commissioner, T.C. Memo. 2005-131, vacated 507 F.3d 1317 (11th Cir. 2007); Estate of Borgatello v. Commissioner, T.C. Memo. 2000-264; Estate of Dunn v. Commissioner, T.C. Memo. 2000-12, revd. 301 F.3d 339 (5th Cir.
(continued...)

Subsequently, the Court of Appeals for the Second Circuit held that a discount for built-in capital gains tax was allowable. See Eisenberg v. Commissioner, supra at 57-59 (citing Estate of Davis v. Commissioner, supra). The court reasoned that since the General Utilities doctrine was repealed, a hypothetical willing buyer would likely pay less for the shares of a corporation because of the contingent capital gains tax liability. Id. It also reasoned that the contingent liability was not too speculative to preclude a discount. Id. The court opined:

> Where there is a relatively sizable number of potential buyers who can avoid or defer the tax, the fair market value of the shares might well approach the pre-tax market value of the real estate. Potential buyers who could avoid or defer the tax would compete to purchase the shares, albeit in a market that would include similar real estate that was not owned by a corporation. However, where the number of potential buyers who can avoid or defer the tax is small, the fair market value of the shares might be only slightly above the value of the real estate net of taxes. In any event, all of these circumstances should be determined as a question of valuation * * * [Emphasis added.[14]]

---

[13](...continued)
2002); Estate of Jameson v. Commissioner, T.C. Memo. 1999-43, vacated 267 F.3d 366 (5th Cir. 2001). In the latter cases, we have projected the tax liability into future years, in some cases allowing for appreciation of the assets, and discounted the built-in LTCG tax liability to its present value as of the valuation date.

[14] The Court of Appeals for the Second Circuit, however, did not prescribe the method to calculate the discount.

Id. at 59 n.16. The court did not determine the amount of the discount and remanded the matter to our Court.

As stated supra, the estate asks us to embrace the dollar-for-dollar approach for valuations adopted by the Court of Appeals for the Eleventh Circuit in Estate of Jelke v. Commissioner, supra, and applied by the Court of Appeals for the Fifth Circuit in Estate of Dunn v. Commissioner, supra, and to speculate as to how the Court of Appeals for the Second Circuit might now rule in view of those decisions.

Respondent, on the other hand, asserts that the estate's position is inconsistent with Eisenberg and, citing Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), asserts that the Court must follow the rule of the Second Circuit.

We decline to speculate as to how the Court of Appeals for the Second Circuit may hold in the future. See Estate of Charania v. Commissioner, 608 F.3d 67, 75 (1st Cir. 2010) (and cases cited thereat), affg. in part and revg. in part 133 T.C. 122 (2009). But we shall consider the parties' positions in view of Eisenberg and this Court's prior decisions.

>    2. Use of Closed-End Funds To Value the Estate's
>       Interest

As stated supra, the estate argues that KTS' calculation of a $490,382.88 discount for Wa-Klo's built-in LTCG tax using data collected for certain closed-end funds is erroneous.

Under the facts of this case, we agree and do not believe that the closed-end funds are comparable to the estate's interest in Wa-Klo. First, Wa-Klo operates a summer day camp, and its assets consist mainly of the single parcel of real estate, its related improvements, and equipment. See sec. 2031(b); Rev. Rul. 59-60, sec. 4.02(h), 1959-1 C.B. 237, 242 (stock of a closely held corporation should be valued by taking into consideration, in addition to other factors, the value of stock of publicly traded corporations engaged in the same or similar lines of business). Closed-end funds, on the other hand, typically invest in various sectors (e.g., utilities and healthcare) and in various asset classes (e.g., securities, real estate, and fixed income).[15] See Schonfeld & Kerwin, "Organization of a Mutual Fund", 49 Bus. Law. 107, 113 (1993).[16] Moreover, closed-end funds invest indirectly in real estate through real estate investment trusts and typically hold multiple investments in

---

[15] Indeed, the closed-end funds that KTS selected invested in various business sectors including energy, healthcare, and utilities.

[16] For information about closed-end funds generally see "The Closed-End Fund Market, 2009", ICI Research Fundamentals, Vol. 19, No. 4 (2010), available at http://www.ici.org/pdf/fm-v19n4.pdf; Closed-End Fund Types and Strategies, CEFConnect.com, available at http://www.cefconnect.com/Education/TypesStrategiesCEF.aspx, and Charles, Wortz, & Kemler, "Closed-End Funds 101", Equity Research, June 30, 2009, available at http://www.closed-endfunds.com/_/docs/content/Learn/ResearchArticles/CEF101_0630.pdf?time=20100707100637.

various types of real estate such as office complexes, apartment buildings, and shopping centers.[17]  Second, discounts from a closed-end fund's net asset value are attributable to several factors including supply and demand, manager or fund performance, investor confidence, or liquidity.  See Kraakman, "Taking Discounts Seriously:  The Implications of 'Discounted' Share Prices as an Acquisition Motive", 88 Colum. L. Rev. 891, 902-905 (1988); Smith, "A Capital Markets Approach to Mass Tort Bankruptcy", 104 Yale L.J. 367, 412-413 (1994).  Moreover, studies on the effects of unrealized capital gains on the discounts from a closed-end fund's net asset value are inconclusive.  See Kraakman, supra at 904; Smith, supra at 413.  Consequently, we do not accord KTS' valuation much weight.

### 3.  Alternate Methods To Avoid Payment of the Built-In LTCG Tax

Respondent, on the basis of his expert's report and testimony, argues that the discount for Wa-Klo's built-in LTCG tax is significantly less than $1,133,283 (or 100 percent) since there are, according to respondent, numerous methods by which potential buyers of the estate's Wa-Klo stock could avoid or defer the tax.

The suggested methods can at best only defer the recognition of the built-in LTCG tax, which we think a hypothetical seller

---

[17]  For the definition of a real estate investment trust see sec. 856.

and buyer would consider in their negotiations.  See <u>Estate of Davis v. Commissioner</u>, 110 T.C. at 550; <u>Estate of Litchfield v. Commissioner</u>, T.C. Memo. 2009-21; cf. <u>Estate of Jones v. Commissioner</u>, 116 T.C. 121, 136-138 (2001) (the hypothetical buyer and seller of certain partnership interests would negotiate with the understanding that a section 754 election, which would eliminate any gains for the purchaser, would be made and the price would not reflect a discount for built-in capital gains). Moreover, each method has its limitations, which a hypothetical seller and buyer would also consider in their negotiations.[18] <u>Eisenberg v. Commissioner</u>, 155 F.3d at 56; <u>Estate of Jameson v. Commissioner</u>, T.C. Memo. 1999-43, vacated 267 F.3d 366 (5th Cir. 2001).

In short, we are not convinced that any viable method for avoidance of the built-in LTCG tax exists for a hypothetical buyer of the estate's Wa-Klo stock.  Thus, we do not think that

---

[18]  For example, electing S corporation status would require the unanimous consent of Wa-Klo's shareholders, and the impact of sec. 469 or 1374 might affect the decision to convert Wa-Klo from C to S corporation status.  See <u>Eisenberg v. Commissioner</u>, 155 F.3d 50, 56 (2d Cir. 1988), vacating T.C. Memo. 1997-483; <u>Estate of Jameson v. Commissioner</u>, T.C. Memo. 1999-43.  Sec. 1031 would require both a willing exchanger and availability of property of the same nature and character.  See <u>Fredericks v. Commissioner</u>, T.C. Memo. 1994-27; <u>Greene v. Commissioner</u>, T.C. Memo. 1991-403; sec. 1.1031(a)-1(b), Income Tax Regs.; see also <u>C. Bean Lumber Transp., Inc. v. United States</u>, 68 F. Supp. 2d 1055, 1058-1059 (W.D. Ark. 1999).

the discount for the built-in LTCG tax is significantly reduced as respondent argues.

D. The Estate's Discount for the Built-In LTCG Tax

As stated supra, the estate argues that it is entitled to a 100-percent discount (i.e., $1,133,283), or something very close thereto, for the built-in LTCG tax.

As also stated supra, we do not give much weight to respondent's expert's valuations. Aside from the flaws discussed supra, respondent's expert did not account for the likelihood that Wa-Klo's assets would appreciate (and that concomitantly the built-in LTCG tax would increase) nor take into account time value of money concepts. See Estate of Litchfield v. Commissioner, T.C. Memo. 2009-21; Estate of Borgatello v. Commissioner, T.C. Memo. 2000-264. We may assume arguendo, on the evidence in the record, that a present-value approach is applicable to determine the estate's discount for the built-in LTCG tax. Taking into account all the facts and circumstances, we have determined a range of values as follows.[19] We have

_____

[19] We agree with both experts that a cost method rather than an income method or a market method should be used to determine the value of the estate's interest in Wa-Klo. See Rev. Rul. 59-60, sec. 5, 1959-1 C.B. 237, 242-243 ("The value of the stock of a closely held investment or real estate holding company * * * is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market values of the assets of the company.").

calculated future values of the $3,300,000[20] fair market value of the land and the related improvements using interest (or appreciation) rates of 5[21] and 7.725[22] percent compounded annually over 17 years as follows:  $7,563,660.44 and $11,692,152.92, respectively.[23]  See Estate of Litchfield v. Commissioner, supra;

---

[20]  This amount is based on the formula $FV = P(1+r)^y$ where P is the principal, r is the rate of interest, and y is the compound period in years.  See, e.g., Hall v. Birchfield, 718 S.W.2d 313, 340 (Tex. App. 1986).

We also note that neither expert discussed the amount of the built-in LTCG tax, if any, attributable to the $5,000 of equipment; thus, we do not do so either.

[21]  Whitney Associates applied a 5-percent appreciation rate in its sale comparison analysis.

[22]  We have calculated an average 7.725-percent pretax return of income based on the data provided by MWE using the following:  7.8% (2001) + 9.3% (2002) + 8.8% (2003) + 5.0% (2004).  We did not include as outliers the 1.6- and the 63.3-percent figures for 2005.

[23]  We have calculated an average useful or depreciable life remaining in the real estate and its related improvements of 16.6 years, which we have rounded up to 17 years, using the depreciation figures estimated by Whitney Associates in its cost method and allowing zero as the depreciation allowance for the real estate.  See Estate of Borgatello v. Commissioner, T.C. Memo. 2000-264 (applying a 1.75-percent capitalization rate and a 24-percent discount rate based on the evidence in the record). Neither party introduced evidence of a turnover period.  We therefore use 17 years as a proxy for the turnover rate on the theory that an asset would be retired once its useful life is exhausted.  See Estate of Litchfield v. Commissioner, T.C. Memo. 2009-21 (accepting expert's estimated annual turnover or sale rates for the assets); Estate of Borgatello v. Commissioner, supra n.10 (assuming a 10-year holding period).  We apply it to the real estate and its related improvements because neither party has provided evidence allocating the $3,300,000 value among the real estate and its related improvements, evidence allocating

(continued...)

[23](...continued)
the estimated tax basis of $500,000 among the real estate and its related improvements, or evidence allocating the built-in LTCG tax among the real estate and its related improvements.  Cf. <u>Gates v. Commissioner</u>, 135 T.C. __, __ n.18 (2010) (slip op. at 23 (Court would not allocate gain among the real estate and the house because the parties did not provide evidence to allow for an allocation).

| Property/improvement | Depreciable years |
| --- | --- |
| Grandpa's House | 15 |
| Boy's Dorm | 20 |
| Maintenance Garage | 15 |
| All Inn | 15 |
| Chatter Box | 20 |
| Cracker Barrel | 25 |
| Sleepy Hollow | 15 |
| Round Up | 25 |
| Pill Box | 25 |
| Chez | 15 |
| Chez Chenet | 2 |
| Candy Shack | 25 |
| Archery | 25 |
| Rifle Range | 25 |
| Stables | 25 |
| Mouse Trap | 15 |
| Danson | 15 |
| Hilltop | 15 |
| Tippit | 15 |
| Bobbin | 15 |
| Arrowhead | 15 |
| Shower House | 25 |
| Somewhere | 15 |
| All Out | 15 |
| Pop Out | 15 |
| Wayside | 15 |
| Jenn-Klo | 15 |
| Sideout | 15 |
| Wayout | 20 |
| Far Out | 20 |
| Driftwood | 20 |
| Roy's Kitchen | 3 |
| Bike Barn | 20 |
| Work Out | 3 |

(continued...)

Estate of Borgatello v. Commissioner, supra.

After taking into account the future values of $7,563,660.44 and $11,692,152.92 and the estimated tax basis of $500,000, we have calculated long-term capital gains of $7,063,660.44 and $11,192,152.92, respectively.  See sec. 1001(a).

The parties have represented that the combined Federal and State tax rate is 40 percent.  Applying a 40-percent tax rate to the long-term capital gains of $7,063,660.44 and $11,192,152.92, we have determined tax liabilities of $2,825,464.18, and $4,476,861.17, respectively.

Applying discount rates of 5 and 7.725 percent compounded annually over 17 years to the built-in LTCG tax liabilities of $2,825,464.18 and $4,476,861.17, we have determined present values[24] (or discounts) for those built-in LTCG tax liabilities of $1,232,740.66 and $1,263,551.88, respectively.[25]  See Estate of Litchfield v. Commissioner, supra; Estate of Borgatello v. Commissioner, supra.

---

[23](...continued)

| Real estate | -0- |
| Total | 583 |

583 (total depreciable years) ÷ 35 (total properties) = 16.7.

[24]  These values are based on the formula Present Value = Future Value ÷ $(1 + r)^n$ where n is the compound period in years and r is the interest rate.

[25]  We note that the estate's share of that discount is 82 percent.

As stated supra, KTS calculated a discount of $490,382.88 for the built-in LTCG tax.  The estate, on the other hand, now asserts that it is entitled to a discount of $1,133,283 for State and Federal taxes.  See supra note 5.

On the basis of the range of values we and the parties have calculated, we accept the estate's value for the built-in LTCG tax discount of $1,133,283 because although not precise, it is within the range of values that may be derived from the evidence (and the estate did not argue for a greater amount).[26]  See Estate of Davis v. Commissioner, 110 T.C. at 537; see also Estate of Litchfield v. Commissioner, supra; Estate of Borgatello v. Commissioner, supra.  We do not give much weight to the $490,382.88 discount that KTS calculated.  The estate's share of that $1,133,283 discount is $929,292.06 (82 percent x $1,133,283).

To reflect the foregoing,

Decision will be entered under Rule 155.

---

[26]  Applying a compound period of zero (assuming an immediate sale of the assets), with either interest rate the present value of the built-in LTCG is $1,200,000.